DALLAS FUEL COMPANY, Appellee, v. ALEXANDER HORNE et al., Claimants, Appellants; IOWA EMPLOYMENT SECURITY COMMISSION, Appellant.

No. 45670.

Henry E. Sampson, F. H. Mackaman, and Havner, Flick & Powers, for appellee.

J. Rudolph Hansen and Haemer Wheatcraft, for claimants, appellants.

J. Charles Crawley, Homer M. Lyon, and George Finch, for Commission, appellant.

WENNERSTRUM, J.—The claimants for unemployment compensation involved in this appeal, upon submission of their claim to the Iowa Employment Security Commission, were awarded unemployment benefits. An appeal was taken to the district court of Dallas County, Iowa, for a review of the decision of the Commission. Upon submission of this cause the district court reversed the Commission upon the record and held that the claimants were disqualified to receive the benefits sought because their unemployment was due to a labor dispute in which they were involved. The district court also enjoined the Commission from making payments to the claimants.

The individuals involved in this appeal were, prior to the time for which they claim unemployment benefits, employed by the Dallas Fuel Company. They were all members of the United Mine Workers of America and were under the particular jurisdiction of District No. 13 (Iowa), of that organization. During the spring of 1937 District No. 13 (Iowa), United Mine Workers of America, through its officers entered into a contract with the Iowa Coal Operator's Association, which contract made provision for the wage scale, working conditions, and hours under which coal would be produced in mines owned by companies that belonged to the Iowa Coal Operator's Association for the two-year period beginning with April 1, 1937, and ending on

March 31, 1939. Contracts of a similar nature between these two groups had been entered into for two-year periods for a number of years. These contracts, and their terms as to working conditions, wages, and hours were substantially the same as the agreements which were negotiated biannually in the Appalachian coal fields, where a large proportion of the coal of the United States is mined. In years past no agreement had been negotiated between the miners' organization, representing the miners of District No. 13, and the Iowa Coal Operator's Association until the basic Appalachian agreement had been concluded. During a part of March 1939 and for a month or more thereafter, negotiations were carried on in New York City for the purpose of concluding an Appalachian agreement. At these conferences representatives of District No. 13 were present. Representatives of the Iowa Coal Operator's Association have participated in these negotiations in the past but the record does not disclose that there was a representative of the Iowa Coal Operator's Association present during the 1939 deliberation.

On March 27, 1939, District No. 13 of the United Mine Workers of America and the Iowa Coal Operator's Association, through their respective officials, entered into a work pending agreement which provided that the mines should continue to be operated after April 1, 1939, under the scale of wages and working conditions incorporated in their agreement for the period of 1937–1939, pending the conclusion of the Appalachian Joint Basic Contract, then being negotiated. It was agreed that this work pending agreement could be canceled on fifteen days notice from either party to the agreement. Similar agreements had been entered into in other parts of the country between the various union district organizations and operators. These work pending agreements were made with the approval of the national officials and the negotiating committees of the miners' union.

On April 19, 1939, John L. Lewis, president of the United Mine Workers of America, sent a communication from New York City, where negotiations were in progress regarding the Appalachian agreement, to the president of District No. 13 of the United Mine Workers of America, which as shown by the record, was in part as follows:

"Negotiations have reached a point that necessitates the

consolidation of the strength of our union. You are therefore directed on receipt of this telegram to file fifteen day notices of .cancellation of all work pending agreements, as well as agreements with individual companies. Please file such notices by telegram confirmed in writing, and subordinate all district activities to the execution of this policy. Written confirmation of this message will follow. This action is taken under the authority vested in the Appalachian negotiating committee by international policy committee. Please confirm receipt. Very truly yours, John L. Lewis."

Pursuant to the above communication the president of District No. 13 gave notice to the president of the Iowa Coal Operator's Association that the work pending agreement would be canceled in fifteen days. No employees of the Dallas Fuel Company reported for work on May 4, 1939, although on May 3, 1939, as shown by the record, the employees were directed by notice on the blackboard maintained at the mine, to "report tomorrow."

The record further shows that the negotiations in regard to the Appalachian Joint Basic Contract started March 14, 1939, and continued until May 11, 1939, when an agreement was reached. Thereafter the representatives of District No. 13 of the United Mine Workers of America and of the Iowa Coal Operator's Association concluded negotiations as to the conditions and terms under which miners would be employed in District No. 13 for the biannual period. The claimants, who had worked in the Dallas Fuel Company mine, filed a claim for unemployment compensation benefits covering the period that they were not employed, and upon hearing, the Commission's deputy allowed their claims. Upon appeal by the Dallas Fuel Company, the Iowa Employment Security Commission ordered the matter of the appeal to be referred to it for immediate consideration. Upon a final hearing the findings and holdings of the deputy were affirmed by a two to one vote of the Commission. There was a majority opinion and decision filed and a minority opinion was also filed by one of the commissioners. As previously stated the Dallas Fuel Company thereafter applied for and secured a temporary injunction in the district court of Dallas County, Iowa, enjoining the payment of unemployment benefits

to the claimants, and upon the submission of the entire issue the district court reversed the Commission and found that the claimants were disqualified to receive benefits because their unemployment was due to a stoppage of work caused, as held by that court, by a "labor dispute." The temporary injunction as to the payment of unemployment benefits was made permanent. The claimants have appealed to this court.

The manner in which rulings of the Iowa Employment Security Commission might be reviewed by a court at the time the present claim arose is noted in the Laws of the 47th General Assembly, chapter 102, section 6 (h), (i), and (j). In section 6 (i), supra, there is found the following statement: "In the absence of fraud the findings of fact made by the commission within its powers shall be conclusive." Section 6 (j), which relates to appeals is as follows:

"Any order or decision of the commission may be modified, reversed, or set aside on one or more of the following grounds and on no other:
"* * *

"3. If the facts found by the commission do not support the order or decree.

"4. If there is not sufficient competent evidence in the record to warrant the making of the order or decision."

We have heretofore held that under the statute above noted each individual case under the unemployment compensation statute must be considered and construed upon the facts as presented and that the court has jurisdiction to rule upon the matters involved, "if the facts found by the commission do not support the order or decree" or "if there is not sufficient competent evidence in the record to warrant the making of the order or decision." Moorman v. Unemployment Compensation Commission, 230 Iowa 123, 131, 296 N. W. 791, 795; Woods Brothers Construction Company v. Iowa Unemployment Compensation Commission, 229 Iowa 1171, 1180, 296 N. W. 345, 349.

The particular portion of the statute which necessitates our further consideration is section 5 and 5 (d) of chapter 102 of the Laws of the 47th General Assembly which is in part as follows:

"Sec. 5. An individual shall be disqualified for benefits:
\* \* \*.

"Sec. 5 (d). For any week with respect to which the commission finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed, \* \* \*."

The Commission found that there was not a labor dispute between the plaintiff and the claimants at the time of the termination of the work pending agreement. The district court held there was not sufficient competent evidence to warrant the making of the order and decision of the Commission. It is our conclusion that the court was correct in its ruling.

Under the National Labor Relation Act (Title 29, section 152 (9), U.S.C.A.) the term "labor dispute" is defined as follows: "The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." With this definition as a guide it is the conclusion of this court that the facts undeniably show that the union officials, national and district, acting for the members of the union under the jurisdiction of District No. 13, were a factor in the negotiations pertaining to the conclusion of the Appalachian Joint Basic Contract. The facts also undeniably show that the United Mine Workers of America is a national organization and that District No. 13 terminated its "pending work agreement" at the direction of the president of the national organization because "negotiations have reached a point that necessitates the consolidation of the strength of our union." Even though the members of District No. 13, United Mine Workers of America were not directly participating in the labor dispute in the Appalachian field, yet by reason of the apparent authority exercised over them by their district officials and the officials of the national organization and its policy committee these members became involved in a labor dispute. It is true that the above definition is found in a federal statute which relates to certain labor relations over

which the federal government has jurisdiction. However, we are of the opinion that the provisions of this definition are applicable to our present problem.

It is contended in the majority opinion of the Commission that if the claimants had continued in employment they would have lost their membership in their union organization and that because of the benefits which they received from this organization in the way of relief in various forms they were justified in following the directions of their officials and that their unemployment was thereby occasioned by "good cause." There is no question in the mind of this court but what the coal miners of this state have benefited economically and socially by reason of the past activities of their organization but the benefits received by claimants from their organization and their continuation of membership do not in our opinion justify us in holding that the unemployment involved in this appeal was for "good cause", when there is an unquestioned labor dispute as is found in the record in this case.

It is our conclusion that where action is taken by either a labor organization or employer that has a bearing upon a controversy as to wages, or conditions of employment that a labor dispute has developed. As stated in the definition (Title 29, supra) this is true "regardless of whether the disputants stand in the proximate relation of employer and employee." The "work pending agreement" was terminated by District No. 13 because, as stated in the Lewis communication, negotiations had "reached a point that necessitates the consolidation of the strength of our union." In following the direction of their union officials, who terminated the "work pending agreement" the claimants became involved in a labor dispute. The fact that they were unable to work because of the termination of the temporary agreement did not prevent their unemployment from being the result of a labor dispute.

It is the contention of the claimants that a labor dispute did not exist. It is their claim that their unemployment was due to a lack of a contract. It is our judgment and conclusion that the failure to negotiate and enter into a contract was due to a labor dispute. Holdings to this same effect are found in Barnes v. Hall, 285 Ky. 160, 146 S. W. 2d 929; Block Coal &

Coke Co. v. United Mine Workers of America, (Tenn.), 148 S. W. 2d 364.

█ It is the further contention of the claimants that the district court had no authority to issue the injunction preventing the payment of the unemployment benefits as ordered by the Commission. In connection with this question our consideration of section 6 (b) of chapter 102 of the Laws of the 47th General Assembly is necessary. The material portion of this section is as follows:

"If an appeal is duly filed, benefits with respect to the period prior to the final determination of the commission, shall be paid only after such determination; provided: That if an appeal tribunal affirms a decision of a deputy, or the commission affirms a decision of an appeal tribunal, allowing benefits, *such benefits shall be paid regardless of any appeal which may thereafter be taken, but if such decision is finally reversed, no employer's account shall be charged with benefits so paid.*" (Italics supplied.)

Further legislative enactments that are involved in this question are found in section 6 (j), previously set out in part, 6 (k) and 6 (l) of chapter 102, supra. The sections not previously quoted are as follows:

"Sec. 6 (k). Judgment or order remanding—When the district court, on appeal, reverses or sets aside an order or decision of the commission, it may remand the case to the commission for further proceedings in harmony with the holdings of the court, or it may enter the proper judgment, as the case may be. Such judgment or decree shall have the same force and effect as if action had been originally brought and tried in said court.

"Sec. 6 (l). Appeal—An appeal may be taken from any final order, judgment, or decree of the district court to the supreme court of Iowa, in the same manner, but not inconsistent with the provisions of this act, as is provided in civil cases. * * *. Upon the final determination of such judicial proceeding, the commission shall enter an order in accordance with such determination. A petition for judicial review shall not act as a supersedeas or stay unless the commission shall so order."

It will be observed that as set out in the concluding sentence of section 6 (1) that "A petition for judicial review shall not act as a supersedeas or stay unless the commission shall so order."

The question naturally arises, whether the legislature had the right or authority to say that a petition for judicial review shall not act as a supersedeas or stay unless the Commission shall so order, or as contended by the appellants, whether the legislature had the right or authority to say that the Commission had the exclusive right to stay the payment of unemployment benefits.

One of the cardinal principles of our form of government is the division of power between the executive, legislative, and judicial. This court, in its prior decisions, has endeavored to preserve to the executive and legislative departments of the state their full powers. We should be equally jealous of preserving to the judiciary the right of passing upon matters that are judicial in nature. This right which we should maintain is not because of any desire to assume authority on the part of the judiciary but because it is our duty to preserve for interested parties their opportunity for a full judicial review and the benefits to be obtained therefrom.

In the case of Wilcox v. Miner, 201 Iowa 476, 478, 205 N. W. 847, 848, this court, speaking through Stevens, J., recognized the established rule that the legislature can not exercise judicial powers, and cited many supporting authorities.

In 7 R. C. L. 1049, Courts, section 84, it is stated:

"In the courts is vested the whole element of sovereignty known as the judicial, established by the constitutions and the laws enacted thereunder, except in a few instances, where powers of a judicial nature are expressly and specifically lodged elsewhere. Of the element of sovereignty, which is exclusively and intrinsically judicial, the people gave the courts all they had to give; and while the domain of the judiciary is not so extensive as that of the other departments, no other power can enter that domain without a violation of the constitution, for within it the power of the judiciary is dominant and exclusive. * * *."

In 11 Am. Jur. 910, Constitutional Law, section 207, it is

stated: "* * *. It is well settled that ministerial officers are incompetent to receive grants of judicial power from the legislature, and their acts in attempting to exercise such powers are necessarily nullities. * * *."

In the case of Denver v. Lynch, 92 Colo. 102, 106, 18 P. 2d 907, 909, 86 A. L. R. 907, 910, the Colorado court, in commenting upon the rights of the respective divisions of the government, stated:

"Generally speaking 'It is incumbent upon each department to assert and exercise all its power whenever public necessity requires it to do so; otherwise, it is recreant to the trust reposed in it by the people. It is equally incumbent upon it to refrain from asserting a power that does not belong to it, for this is equally a violation of the people's confidence. Indeed, the distinction goes so far as to require each department to refrain from in any way impeding the exercise of the proper functions belonging to either of the other departments.' State v. Cunningham, 39 Mont. 165, 168, 101 P. 962, 963.

"The practical application of this rule is sometimes difficult and the line of demarcation between the departments often indefinite. But, as will be later observed, we are not here embarrassed by fine distinctions. It is universally held that the legislative department is powerless to confer judicial duties upon the officials of other departments. Sing Tuck v. U. S., 128 F. 592, 63 C. C. A. 199; Corbett v. Widber, 123 Cal. 154, 55 P. 764."

It is our conclusion that the exclusive jurisdiction for the issuance of a restraining or injunctive order can not be held to be in the Commission. It is our further conclusion that, upon the pleadings as filed by the plaintiff in the district court, and the resistance thereto, this question has been properly raised and that we are in a position to rule thereon.

Upon a full consideration of the record before us and the question submitted to us for consideration we hold that the trial court was correct in its decision and that it should be affirmed.— Affirmed.

MILLER, C. J., and GARFIELD, STIGER, SAGER, OLIVER, HALE, and BLISS, JJ., concur.